UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-21900-CIV-ALTONAGA/Goodman

**LESSIE GLOVER**,

    Plaintiff,

v.

**LLIBERTY MUTUAL INSURANCE COMPANY**, *et al.*,

    Defendants.

_____/

## **ORDER**

**THIS CAUSE** came before the Court for a hearing on September 25, 2019, on Defendants, Liberty Mutual Insurance Company ("Liberty Mutual") and LM General Insurance Company's ("LM General['s]") Motion to Dismiss Amended Complaint with Prejudice [ECF No. 24], filed July 10, 2019. Plaintiff, Lessie Glover, filed an Opposition to Defendants' Motion to Dismiss [ECF No. 32], attaching supporting case law as exhibits [ECF Nos. 32–1 to 32–4]. Defendants filed a Reply to Plaintiff's Opposition [ECF No. 33], to which Plaintiff filed a Surreply in Opposition [ECF No. 52]. The parties also filed supplemental authorities. (*See* [ECF Nos. 53 and 60]). The Court has carefully considered the parties' written submissions, the Amended Class Action Complaint [ECF No. 11], applicable law, and the parties' oral arguments.

### **I.   BACKGROUND**

Plaintiff brings this putative class action alleging a single breach of contract claim against both Defendants. (*See generally* Am. Compl.). Plaintiff was a named insured on a LibertyGuard Auto Insurance Policy ("Insurance Policy") effective July 25, 2016 through July 25, 2017. (*See id.*, Ex. A, Insurance Policy [ECF 11-1] 1). Plaintiff alleges Defendants have a practice of refusing

to pay full Actual Cash Value ("ACV"), including state and local title transfer and vehicle registration fees, to first-party total loss insureds like Plaintiff, on physical damage policies containing comprehensive and collision coverages. (*See id.* ¶ 3). Defendants' failure to pay full ACV damaged Plaintiff and members of the proposed Florida class of insureds. (*See id.*).

Massachusetts-based Liberty Mutual handles and adjusts insurance claims and is responsible for policy language and claims adjustments. (*See id.* ¶¶ 8, 11). Illinois-based LM General is a wholly-owned underwriter of Liberty Mutual, entirely directed and controlled by Liberty Mutual. (*See id.* ¶¶ 9, 10). Liberty Mutual, "including by and through LM General[,]" uses the same form language in Plaintiff's Insurance Policy as it does in the policies of all Class Members. (*Id.* ¶ 14 (alteration added)).

Defendants' standardized policy language promises, upon the occurrence of a total loss to an insured vehicle, to pay the ACV of the insured vehicle to the insured. (*See id.* ¶ 15). In this regard, the Insurance Policy states:

> A. Our limit of liability for loss will be the lesser of the:
>
> 1. Actual cash value of the stolen or damaged property;
>
> 2. Amount necessary to repair or replace the property with other property of like kind and quality.
>
> However, the most we will pay for loss to any "non-owned auto" which is a trailer is $500.
>
> B. An adjustment for depreciation and physical condition will be made in determining actual cash value in the event of a total loss.

(Insurance Policy 14).[1] According to Plaintiff, under the Insurance Policy and applicable state law, ACV equates to the Full Total Loss Payment ("FTLP") required to replace a vehicle, which

---

[1] The Court uses the pagination supplied by the Court's electronic case management system, which appears as a header on all pages filed.

includes the obligation to pay state and local fees. (*See id.* ¶¶ 1, 17). Such fees include title transfer fees and tag transfer fees, each of which is a mandatory fee imposed by the State of Florida. (*See id.* ¶ 17).

Plaintiff alleges the "promise to pay ACV — unlike a true Replacement Cost provision, which requires payment of actual costs incurred and does not allow for deductions for depreciation or physical condition — allows for deductions based on the vehicle's depreciation and condition but does not require the costs be incurred." (*Id.* ¶ 18). The promise to pay ACV is a predictable amount upon which Defendants and insureds can rely. (*See id.*). The ACV of a vehicle is independent from the amount originally paid, if any, for the total-loss vehicle; and the amount paid, if any, to replace the total-loss vehicle. (*See id.*). Given a vehicle's ACV takes into account depreciation, condition, and costs reasonably likely to be incurred in vehicle replacement, the promise to pay the ACV of a total-loss vehicle is a promise to pay the FTLP, including underlying adjusted vehicle value, plus sales tax, plus title transfer fee ($75.25), plus tag transfer fee ($4.60), less any applicable deductible and salvage retention. (*See id.* ¶ 19).

Plaintiff owned a vehicle insured under Defendants' Insurance Policy and was involved in an accident. (*See id.* ¶¶ 20–22). Defendant LM General paid Plaintiff an amount that did not include title transfer or tag transfer fees. (*See id.* ¶¶ 23–26; Ex. C [ECF No. 11-3]). Title transfer fees and tag transfer fees are mandatory fees that must be paid to replace any vehicle in Florida. (*See id.* ¶ 27). Defendants, "pursuant to a standard and uniform business practice, never pays [sic] insureds FTLP, including title and tag transfer fees, after a total-loss to an insured vehicle, notwithstanding its [sic] contractual obligation to do so." (*Id.* ¶ 28). "Defendants breached its [sic] Insurance Policy with Plaintiff by failing to pay any amount for title transfer fees and tag

transfer fees when it [sic] paid Plaintiff what it [sic] purported to be the ACV of the total loss of the Insured Vehicle." (*Id.* ¶ 31).

The Amended Complaint contains a single breach-of-contract claim, alleging Plaintiff "was a party to a contract, the Insurance Policy, with Defendants." (*Id.* ¶ 63). The Insurance Policy shows the insurer is LM General and not Liberty Mutual. (*See* Insurance Policy 1).

## II.　STANDARD

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (alteration added) (quoting *Twombly*, 550 U.S. at 555). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).

To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (alteration added) (citing *Twombly*, 550 U.S. at 556). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012).

On a motion to dismiss, a court construes the complaint in the light most favorable to the plaintiff and accepts its factual allegations as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)). Unsupported allegations and conclusions of law do not benefit from this favorable reading. *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."); *see also Sinaltrainal*, 578 F.3d at 1260 ("[U]nwarranted deductions of fact in a complaint are not admitted as true for the purpose of testing the sufficiency of [a] plaintiff's allegations." (alterations added; internal quotation marks omitted) (quoting *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005); other citation omitted)).

The scope of review on a motion to dismiss under Rule 12(b)(6) is limited to the four corners of the complaint and the exhibits attached. *See Thaeter v. Palm Beach Cnty. Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006) (citation omitted).

### III.  ANALYSIS

Defendants move to dismiss, with prejudice, Plaintiff's Amended Complaint. Defendants first argue the Court should dismiss the Amended Complaint's single breach-of-contract claim because an insurer is not required to pay title and tag transfer fees as part of the actual cash value of a total loss of a motor vehicle. (*See generally* Mot.). In support of this case-dispositive argument, Defendants assert Florida Statutes section 626.9743(5) governs whether the payment of title and tag transfer fees is part of an actual cash value payment on a total loss settlement; and section 626.9743(5) does not require title and tag transfer fees be included in actual cash value. (*See id.* 3–8). Second, Defendants argue the Court should dismiss Liberty Mutual because it did

5

not issue the Insurance Policy and no valid alter-ego or other theory is stated to keep Liberty Mutual in the case. (*See id.* 14–18). The Court considers the parties' positions below.[2]

### A. Florida Statutes Section 626.9743(5) and ACV as Used in the Insurance Policy

The parties agree Florida law governs the determination of the issues raised, given federal jurisdiction is based on the diversity of the parties' citizenship and the Insurance Policy was entered in Florida for a Florida-based Plaintiff. "[M]otor vehicle insurance is an area . . . 'surrounded by statutory limitations[,]' [and so] [t]he Court . . . presumes that the parties entered into the contract with knowledge of the statutory provisions, and those provisions became a part of the contract." *Geico Gen. Ins. Co. v. Schwinn*, No. 8:04CV1485T17TBM, 2006 WL 1529092, at *6 (M.D. Fla. May 30, 2006) (alterations added).

Pertinent here, Florida Statutes section 626.9743, titled "Claim settlement practices relating to motor vehicle insurance," provides in part:

> (1) This section shall apply to the adjustment and settlement of personal and commercial motor vehicle insurance claims.
>
> \* \* \*
>
> (5) When the insurance policy provides for the adjustment and settlement of first-party motor vehicle total losses on the basis of actual cash value or replacement with another of like kind and quality, the insurer shall use one of the following methods:
>
> (a) The insurer may elect a cash settlement based upon the actual cost to purchase a comparable motor vehicle, including sales tax, if applicable pursuant to subsection (9). Such cost may be derived from:
>
> 1. When comparable motor vehicles are available in the local market area, the cost of two or more such comparable motor vehicles available within the preceding 90 days;

---

[2] Defendants also request the Court "dismiss" all claims and allegations in the Amended Complaint regarding sales tax. (*See id.* 19–20). There are no claims regarding sales tax. The Court finds the request unpersuasive and declines to address it further.

6

>    2. The retail cost as determined from a generally recognized used motor vehicle industry source . . . ;
>
>    3. The retail cost using two or more quotations obtained by the insurer from two or more licensed dealers in the local market area.
>
>    \* \* \*
>
>    (9) If sales tax will necessarily be incurred by a claimant upon replacement of a total loss or upon repair of a partial loss, the insurer may defer payment of the sales tax unless and until the obligation has actually been incurred.
>
>    (10) Nothing in this section shall be construed to authorize or preclude enforcement of policy provisions relating to settlement disputes.

Fla. Stat. § 626.9743 (alterations added).

The Insurance Policy states LM General will pay a claim for damage to an insured vehicle based on the lesser of the actual cash value of the stolen or damaged property or the amount necessary to repair or replace the property with property of like kind and quality. (*See* Insurance Policy 14). While the Insurance Policy defines certain terms, it does not define actual cash value or ACV.

To support her breach-of-contract claim, Plaintiff alleges ACV, when undefined in a policy as here, includes "title and transfer tag fees necessarily incurred upon replacement of the insured vehicle." (Am. Compl. ¶ 40). Defendants state this allegation is simply a legal conclusion, not afforded the presumption of truth. (*See* Mot. 3 (citing *Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1262 (11th Cir. 2015)). While the allegation need not be presumed true, the result of the Court's examination of the issues proves it to be a plausible one.

Florida Statutes section 626.9743(5) requires insurers operating in the State to "use one of the following methods" in adjusting and settling first-party motor vehicle total losses. *Id.* Given use of the term "shall," section 626.9743(5) is mandatory. *See, e.g.*, *City of St. Petersburg v. Remia*, 41 So. 3d 322, 326 (Fla. 2d DCA 2010) (noting statutory "use of the mandatory term 'shall'

normally creates an obligation impervious to judicial discretion" (citation omitted)). "Generally, 'shall' is interpreted to be mandatory where it refers to some action preceding the possible deprivation of a substantive right and directory where it relates to some immaterial matter in which compliance is a matter of convenience." *Id.* (internal quotation marks and citations omitted). In the context of adjusting and settling first-party motor vehicle total losses on the basis of ACV or replacement, the Florida Legislature's use of the phrase "shall use one of the following methods" is a command and not merely a matter of convenience.

> It is well-accepted that
>
> [l]aws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms. This principle embraces alike those laws which affect its construction and those which affect its enforcement or discharge.

*Norfolk and Western Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 130 (1991) (alteration added; quotation marks and citation omitted). *See also Shavers v. Duval Cty.*, 73 So. 2d 684, 689 (Fla. 1954); *Dimitri v. Commercial Ctr. of Miami Master Ass'n, Inc.*, 253 So. 3d 715, 718–19 (Fla. 3d DCA 2018). And a "statute in effect at the time an insurance contract is executed governs substantive issues arising in connection with that contract." *Hassen v. State Farm Mut. Auto. Ins. Co.*, 674 So. 2d 106, 108 (Fla. 1996) (citation omitted). Given these long-standing principles, the Court agrees with Defendants that the statutory method for determining ACV described in section 626.9743(5) serves to furnish a definition of the undefined ACV in the Insurance Policy and describes what items are included in ACV.

*Shelton v. Liberty Mutual Fire Insurance Company*, 578 F. App'x 841 (11th Cir. 2014), is particularly instructive in illustrating why Defendants' construction of ACV, dependent on the Florida statute's definition, is preliminarily correct. In *Shelton*, the insureds made a claim under

8

their insurance policy for a sinkhole loss to their property. *See id.* at 843. The policy provided sinkhole loss meant "structural damage" to the building, but it did not define the key phrase "structural damage." *Id.* The insurer denied the claim on the basis the damage to the insured's house did not qualify within the technical, five-part definition of "structural damage" set forth in Florida Statutes section 627.706(2)(k). *See id.* at 843–844.

The district court granted the insureds summary judgment, finding the statutory definition of structural damage was inapplicable because the policy did not reference or incorporate the statute. *See id.* at 844. The Eleventh Circuit reversed. *See id.* at 846. The court began its analysis by acknowledging that the laws of Florida are a part of every Florida contract and govern the substantive issues arising in connection with those contracts. *See id.* at 845 (citations omitted). In turn, the court concluded "the statutory definition of 'structural damage' in section 627.706(2)(k) governs the construction of the phrase 'structural damage' in the [insureds'] policy. The Florida legislature expressly stated that the statutory definition applies when the term 'structural damage' is '*used in connection with any policy providing coverage . . . for sinkhole losses.*'" *Id.* (first alteration added; emphasis in original; quoting Fla. Stat. § 627.706(2)(k)). Because "the statutory definition of 'structural damage' is a part of the" insureds' policy, *id.*, and there was no indication in the policy the parties intended to depart from the statutory definition, it was error to construe "structural damage" as used in the policy by looking to the phrase's plain and ordinary meaning, *id.* at 846.

Also persuasive is *Grant v. State Farm Fire and Casualty Company*, 638 So. 2d 936 (Fla. 1994). In *Grant*, the Florida Supreme Court affirmed the lower courts' decisions finding the owner and operator of a motorcycle involved in an accident was not entitled to uninsured motorist coverage. *See id.* at 937–938. At issue was whether a motorcycle was a motor vehicle under the

9

Uninsured Motor Vehicle section of the policy, which denied coverage for bodily injury to an insured while occupying a motor vehicle if it was not insured for this coverage under the policy. *See id.* at 937. The operator maintained a motorcycle was not a motor vehicle because the No-Fault Coverage section of the policy defined a motor vehicle as "a vehicle with four or more wheels." *Id.* The Florida Supreme Court agreed with the insurer that in the absence of a definition of motor vehicle in the Uninsured Motor Vehicle section of the policy, the statutory definition of motor vehicle found in Florida's Financial Responsibility Law, defining a motor vehicle as a "self-propelled vehicle which is designed and required to be license for use upon a highway," supplied "the applicable definition." *Id.* at 937–938 (quoting Fla. Stat. § 324.021(1)).

Plaintiff disagrees with Defendants' position, and by extension with the foregoing analysis, insisting Defendants' "selectively narrow reading of Fla. Stat. § 626.9743(5) trumps established Florida law which makes clear that actual cash value ("ACV") includes costs reasonably likely to be incurred in replacing a vehicle." (Resp. 2). Yet, under Florida law, "the absence of an alternative definition means that the statutory definition fills the gap." *Shelton*, 578 F. App'x at 846. Thus, the Court agrees with Defendants section 626.9743(5) is incorporated into the Insurance Policy and the Court must look to how the statute directs the ACV of a total loss be calculated. (*See* Mot. 6). The Court now turns to that task.

      **B.**      **Calculation of ACV Under Section 626.9743(5), Florida Statutes**

As noted, section 626.9743(5) states ACV is based on the "actual cost to purchase a comparable motor vehicle, including sales tax." *Id.* According to Defendants, the "plain" statutory language of the "cost to purchase" a vehicle does not include ancillary fees, and if the Legislature had intended title and tag fees to be part of the "actual cash value," it would have said

10

so. (*See* Mot. 6). Defendants' reasoning supporting their construction of the statute proceeds in the following manner.

First, given the "Omitted-Case Canon" statutory canon, "nothing is to be added to what the text states or reasonably implies," or "a matter not covered is to be treated as not covered," and title and tag transfer fees are "a matter not covered" in the statute's definition of "cost to purchase" a vehicle. (*Id.* (internal quotation marks and citations omitted)). Second, construing the statute as a whole adds further support to the conclusion that title and tag transfer fees are not included in the statute's "actual cost to purchase a comparable motor vehicle" (*id.* 7) because section 626.9743(5) specifically identifies sales tax as part of the actual cost to purchase but does not identify tag and transfer fees. (*See id.*). According to Defendants, if the Legislature had intended fees to be part of ACV, it would have said so. (*See id.*). Third, the statute permits insurers to "defer payment of the sales tax unless and until the obligation has actually been incurred" and does not contain a similar provision for title and tag transfer fees. (Mot. 7 (quoting Fla. Stat. § 626.9743(9))). If the fees are part of the "actual cost to purchase a comparable motor vehicle," as Plaintiff contends, section 626.9743 would permit insurers to withhold sales tax until incurred but prohibit a similar provision in policies for title and tag transfer fees — and this is not a fair reading of the statute. (*See* Mot. 7).

Defendants' construction of section 626.9743(5) is not supported by canons of statutory construction or the plain language of the statute itself. The Court again turns to the statutory language: "When the insurance policy provides for the adjustment and settlement of first-party motor vehicle total losses on the basis of actual cash value . . . the insurer shall use one of the following methods: (a) The insurer may elect a cash settlement based upon the ***actual cost to***

*purchase a comparable motor vehicle, including sales tax, if applicable* . . ." *Id.* (emphasis and alterations added).

It is fundamental that "'legislative intent is the 'polestar' that guides [the] Court's interpretation.'" *White v. Mederi Caretenders Visiting Serv. of Southeast Fla., LLC*, 226 So. 3d 774, 779 (Fla. 2017) (citation omitted; alteration added). And "'[t]o determine the legislative intent [the Court] look[s] to the plain language of the statute.'" *Id.* (citation omitted; alterations added). The Florida Legislature in section 626.9743(5) used the word "including," which like "its more specific, arguably redundant cousin, *including, but not limited to*," "impl[ies] that there are necessarily more relevant factors than those [the Legislature] enumerated." *Macon Cnty. Samaritan Mem'l Hosp. v. Shalata*, 7 F.3d 762 (8th Cir. 1993) (emphasis in original; alterations added). *See also United States v. Howard*, 742 F.3d 1334 (11th Cir. 2014) ("The items that follow each use of the word 'includes' in the statute are non-exhaustive examples of items that qualify as a 'structure' and thus count as a 'building' under [the] Alabama Code . . . ." (alterations added; citations omitted)); *Stansell v. Rev. Armed Forces of Colombia*, 704 F.3d 910, 915 (11th Cir. 2013) (finding a statutory definition declaring what a term "includes" is "merely illustrative" – not exhaustive.).

That "including" carries this non-exhaustive meaning in statutory construction is not novel. In *White*, for example, the Florida Supreme Court examined Florida Statute section 542.335, defining "legitimate business interest" as "includ[ing], but [] not limited to" an enumerated list of interests, and concluded "[t]he statute was never designed or intended to be an exhaustive list." *White*, 226 So. 3d at 780–781 (alterations added). In disapproving intermediate appellate courts' contrary constructions, the Supreme Court in *White* noted, "because the statute does not expressly exclude any claimed interests, it seems that those courts necessarily applied the principle

12

expression unius est exclusion alterius – 'the mention of one thing implies the exclusion of another.'" *Id.* at 781 (citation omitted; emphasis in original). Yet, expression unius does not apply "to a statute in which the Legislature used the word 'include.'" *Id.* (citation omitted; emphasis in original). "[T]he Legislature uses the word 'including' in a statute as a word of expansion, not one of limitation." *Id.* (alteration added; citations omitted). Consequently, "includes, but is not limited to" signifies "the Legislature intended to allow the protection of more interests than simply those set forth in the non-exhaustive list." *Id.* at 783.

Similarly, in *Childers v. State*, 936 So. 2d 585, 596–97 (Fla. 2006), the Florida Supreme Court considered whether the term "victim" as used in Florida Statute section 775.089, included a county in addition to a person, and therefore whether the trial court erred in denying restitution to Escambia County. The following discussion is instructive here:

> In section 1.01(3), the legislature has defined "person" by providing a list of people and entities each of which is deemed a "person." Because "person" "includes" the list of individuals and entities, we conclude that the legislature did not intend this list to be a limiting and exhaustive definition of the term. In standard usage, the use of the term "include" does not indicate that a list of subjects is exhaustive. . . . [T]he author Bill Bryson explains that "include indicates that what is to follow is only part of a greater whole. To use it when you are describing a totality is sloppy. . . . ." . . . If the statute provided that "person" included "only" those individuals and entities specifically mentioned in the statute, or defined "person" using the more exhaustive word, such as "means," we would agree with appellant's argument. By the use of the non-limiting term "includes," however, the list used to define "person" is illustrative rather than exhaustive.

*Id.* at 597 (second ellipses in original; internal citation omitted; alterations added).

Because of the well-accepted construction given a statute's use of the word "includes," the undersigned does not agree the Florida Legislature intended to exclude from "actual cost to purchase a comparable motor vehicle, including sales tax, if applicable," Fla. Stat. § 626.9743(5), ancillary fees as part of "actual cash value." The Florida Legislature understood by using

"includes," it was providing a non-exhaustive definition[3] of the term ACV. Defendants' construction of the statute is contrary to canons of statutory construction and misreads its plain text. While the statue is certainly incorporated in the Insurance Policy and helps to define the undefined ACV, it does not provide an exhaustive definition that excludes Plaintiff's proposed construction as offered in her pleading.

### C. Whether Plaintiff States a Claim for Relief

Given Florida Statute section 626.9743(5) provides a non-exhaustive method for calculating the actual cost to purchase a motor vehicle, to include, but not be limited to sales tax where applicable, the next issue presented is whether Plaintiff states a claim for relief under a theory of breach of contract. A breach-of-contract claim has three elements: a valid contract, a material breach, and damages. *See Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999) (citation omitted); *J.J. Gumberg Co. v. Janis Serv., Inc.*, 847 So. 2d 1048, 1049 (Fla. 4th DCA 2003) (citation omitted). Absent ambiguity in an insurance policy's language, "insurance contracts must be construed in accordance with the plain language of the policy." *Swire Pac. Holdings. Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003). Where "policy language is susceptible to more than one reasonable interpretation, one providing coverage and [] another limiting coverage, the insurance policy is considered ambiguous." *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000) (alteration added; citations omitted). "Ambiguous policy provisions are interpreted liberally in favor of the insured and strictly against the drafter who prepared the policy." *Id.* (citations omitted).

---

[3] The Court recognizes Plaintiff disputes section 626.9743 defines ACV, insisting the statute merely prescribes the method by which an insurer must determine the cost of comparable vehicles, and which applies when policies promise payment of ACV or replacement costs. According to Plaintiff, "[p]rescribing the methodology by which to find the costs of comparable vehicles is not a definition . . . ." (Resp. 14, n.7 (alteration added)). The Court does not resolve whether the statute provides a definition, but rather assumes it does – a non-exhaustive definition.

To state a viable breach-of-contract claim, Plaintiff must plausibly allege the failure to pay title transfer and registration fees is a breach of the Insurance Policy's promise to pay the ACV of Plaintiff's insured vehicle. Again, the Insurance Policy does not define ACV. While "[t]he lack of a definition of an operative term in a policy does not necessarily render the term ambiguous and in need of interpretation by the courts," "where policy language is subject to differing interpretations, the term should be construed liberally in favor of the insured and strictly against the insurer." *State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So. 2d 1072, 1976 (Fla. 1998) (alteration added; citations omitted). Furthermore, "when an insurer fails to define a term in a policy, . . . the insurer cannot take the position that there should be a narrow, restrictive interpretation of the coverage provided." *Id.* (internal quotation marks and citations omitted; alteration in original).

As explained, the statute Defendants ask the Court to use to define ACV provides a non-exhaustive definition. Consequently, while that statutory "definition" applies, it is also appropriate to look to how Florida case law defines ACV to determine if Plaintiff's breach-of-contract claim is plausible, bearing in mind ACV should be construed liberally in favor of Plaintiff and strictly against the insurer who failed to define the term in its Insurance Policy.

As noted by Plaintiff, Florida and federal courts applying Florida law have defined the standard for ACV as repair or replacement, minus the cost of depreciation, which includes sales tax and registration fees. (*See* Resp. 6–7; 11–13 (citing cases)). In *Sos v. State Farm Mutual Automobile Insurance Company*, No. 6:17-cv-890-Orl-40KRS, 2019 WL 3940227, at *3 (M.D. Fla. Mar. 13, 2019), the insurance policy, like the one here, did not define ACV. The district court noted "[w]hen faced with a policy leaving actual cash value undefined, Florida courts have found the term to mean replacement cost minus depreciation." *Id.* (alteration added; citing *Trinidad v.*

*Fla. Peninsula Ins. Co.*, 121 So. 3d 433, 443 (Fla. 2013); *Goff v. State Farm Fla. Ins. Co.*, 999 So. 2d 684, 690 (Fla. 2d DCA 2004)). In *Trinidad*, the Florida Supreme Court defined ACV of a house damaged by fire as "fair market value or [r]eplacement cost minus depreciation, where depreciation is defined as a 'decline in asset value because of use, wear, obsolescence, or age." 121 So. 3d at 438 (internal quotation marks and citation omitted; alteration in original). In *Goff*, the court stated determining the ACV of a home insured under a policy that did not define ACV was not an "insoluble problem" and agreed ACV "is an often-used appraisal term, generally synonymous with market value or fair market value," which "accounts for the property's depreciated condition." 999 So. 2d at 689 (internal quotation marks, citations, and footnote call number omitted).

Returning to *Sos*, the court there concluded "sales tax and fees are costs an insure[d] is reasonably likely to incur in replacing his leased vehicle, and therefore are components of actual cash value under the Policy." 2019 WL 3940227, at *5 (alteration added; citation omitted). In asserting her breach-of-contract claim, then, Plaintiff plausibly alleges — consistent with the statute that is incorporated in the Insurance Policy — the failure to include mandatory state fees constitutes a breach of the promise to pay ACV.

## D. Whether Liberty Mutual Should be Dismissed

The parties agree Liberty Mutual did not issue the Insurance Policy; rather, LM General issued it. Defendants argue there is no privity of contract between Liberty Mutual and Plaintiff to support a breach-of-contract claim. (*See* Mot. 15–17). Further, Defendants argue there is no alter-ego or other theory alleged in the Amended Complaint to keep Liberty Mutual in the case. (*See id.* 17–18). Defendants are correct in both assertions. *See, e.g.*, *Katchmore Luhrs, LLC v. Allianz Global Corp. & Specialty*, No. 15-CIV-23420, 2017 WL 432671, at * 7 (S.D. Fla. Jan. 31, 2017)

("Allianz is not a party to the contract. There is no privity between Allianz and Katchmore and Allianz therefore has no contractual obligations to Plaintiff."); *Johnson v. Enter. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1320 (11th Cir. 1998) (to pierce the corporate veil and hold the parent corporation liable for the actions of its subsidiary, a plaintiff must allege: "the subsidiary was a 'mere instrumentality' of the parent, *and* . . . the parent engaged in 'improper conduct' through its organization or use of the subsidiary." (emphasis in original; alteration added; citation omitted)).

Plaintiff relies on *AA Suncoast Chiropractic Clinic, P.A. v. Progressive American Insurance Company*, No. 8:15-cv-2543-T-26MAP, 2016 WL 740719, at *2 (M.D. Fla. Feb. 25, 2016), where the court allowed a claim against the parent corporation on the theory it could be held liable "for its own direct participation in its own wrongful policies and procedures through the direction and control of its subsidiaries." *Id.* (citations omitted). While that may have been the case in *AA Suncoast Chiropractic Clinic*, where the plaintiff was seeking injunctive relief to stop the parent and subsidiary from their routine practice of avoiding the PIP statute, *see id.* at *1–2, here Plaintiff merely states a single breach-of-contract claim against both Defendants. Plaintiff does not allege the existence of a contract with Liberty Mutual upon which it can obtain relief should it prevail in proving a breach of the Insurance Policy. Consequently, the Court agrees Liberty Mutual must be dismissed from the action.

## IV. CONCLUSION

Based upon the foregoing analysis, it is

**ORDERED AND ADJUDGED** that Defendants, Liberty Mutual Insurance Company and LM General Insurance Company's Motion to Dismiss Amended Complaint with Prejudice **[ECF No. 24]** is **GRANTED** in part and **DENIED** in part. Liberty Mutual is dismissed from the action.

CASE NO. 19-21900-CIV-ALTONAGA

**DONE AND ORDERED** in Miami, Florida, this 4th day of October, 2019.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:   counsel of record